# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No.  2:21-cr-114 |
| vs. | : | JUDGE MORRISON |
| JOSHUA HAYNES. | : | |
| Defendant. | : | |

## JOSHUA HAYNES'S SENTENCING MEMORANDUM

**I.     INTRODUCTION.**

On July 21, 2021, Joshua Haynes (hereafter "Josh" or "Mr. Haynes" alternately) entered a plea of guilty to one count of Possession of Child Pornography per 18 U.S.C. 2251(a)(4)(b) and(b)(2). Mr. Haynes is now before the Court for sentencing. The Court is tasked with imposing "a sentence sufficient, but not greater than necessary," to vindicate Congress' sentencing mandate, set forth in 18 U.S.C. § 3553(a)(2). The Court must begin sentencing proceedings by first correctly calculating the applicable guideline range. *Gall v. United States*, 128 S. Ct. 586, 596 (2007). However, this guideline range is only "the starting point and the initial benchmark." The Court "may not presume that the guideline range is reasonable." *Id.* at 596-97. A sentencing court is "free to make its own reasonable application of the 18 U.S.C. § 3553(a) factors, and to reject (after due consideration) the advice of the guidelines." *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring). "[E]xtraordinary circumstances [are not required] to justify a sentence outside of the guidelines range." *Gall* at 595.

## II. SENTENCING FRAMEWORK.

Per the calculation by the U.S. Probation Office, Mr. Haynes carries an offense level of 30 and a Criminal History Category of III. At these parameters, the advisory guideline range is 121-151 months. Defense counsel, however, has filed an objection with regard to the calculation. If the Court were to agree with this analysis, Mr. Haynes would be subject to an advisory guideline range of 87-108 months.

Even using this framework, however, Mr. Haynes maintains that the sentencing guidelines call for a range that does not reflect the circumstances of Mr. Haynes's life nor the reality of modern technology as they pertain to this type of offense. A period of 36-60 months incarceration would satisfy Congress' codified purposes in sentencing because it would reflect the seriousness of the offense; provide just punishment; provide adequate deterrence; and protect the public from further crimes committed by Mr. Haynes. 18 U.S.C. § 3553(a)(2).

### III. SENTENCING FACTORS—18 U.S.C. § 3553(a).

The final step of the sentencing analysis requires this Court to determine what sentence is sufficient, but not greater than necessary, to satisfy Congress' sentencing mandate. Counsel points to the following three § 3553(a) factors to answer this statutory question: (1) Josh's history and characteristics; (2) the nature and circumstances of the offense and (3) the sentencing range called for by the plea agreement. In the end, counsel submits that a sentence of 36-60 months would vindicate Congress' sentencing mandate as it would not diminish the seriousness of his offense, and would provide just punishment, adequate deterrence and protection of the public.

#### a. JOSHUA HAYNES'S HISTORY AND CHARACTERISTICS—§ 3553(a)(1).

While counsel typically would typically use this space to describe Josh's personal history and to what extent his past has tied into his current circumstances, this history is better described within Dr. Jaime Adkins's Sexual Risk Assessment, filed with this Court under seal. At first glance, Josh's life appears to be rather ordinary and devoid of extraordinary traumatic events that may have been a turning point in his life. A closer inspection shows a life marred by a thousand small cuts along the way: a suicide attempt at 7-years old here, a college education forfeited there. Throughout it all, a profound sadness appears to permeate throughout his childhood and into his adult life.

Still, this chronic depression is but one facet of Josh's life, and there has been light within the darkness. Certainly, his family knows him as a beloved father, son, friend, student, and co-parent (see attached Exhibit A: Haynes letters). They know Josh as a dependable, empathetic person who others often sounded off to about their own issues. Josh, unfortunately, was also

known to keep his feelings to himself rather than open himself up to his loved ones (even as he shared some of his demons with mental health professionals). These unexpressed feelings ultimately led to a fundamentally unhappy person experiencing a fundamentally unhappy marriage and life in general.

Josh has only just begun to realize these fundamental truths about his existence as he has sat for this ten months in jail. As his head has begun to clear, he has started to work on changing some of these circumstances. Josh signed divorce papers with some melancholy but with an ultimate understanding that it was the best move for both him and his now ex-wife, Ashley. He refocused on his Christian faith that was a large part of his upbringing. He not only made his mental health a priority to the best of his abilities while he has been incarcerated, but he began focusing on his physical health. When he was arrested, Josh weighed 370 pounds and had significant diabetes-related health issues. Since his incarceration, Josh began exercising every day and has lost more than 70 pounds. In doing so, he began to get some of those medical issues under control. Ironically, it was only after being arrested and incarcerated that Josh began to take control of his life, perhaps for the very first time.

Had he been more open about what he was feeling over the years, perhaps Josh could have found these more constructive outlets earlier to help him cope. Unfortunately, the outlets he latched on to led him down this path that brings him before the Court.

> **b. NATURE AND CIRCUMSTANCES OF THE OFFENSE; THE SENTENCING RANGE ESTABLISHED BY THE SENTENCING GUIDELINES; THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES—§§ 3553(a)(1) and (a)(4).**

Nature and circumstances of the offense

As the Government has painstakingly pointed out, the offense for which Mr. Moore stands convicted is indisputably serious; however, his behavior must be viewed in context with his background, past mental health issues, and the nature of his conviction. For his part, Josh pleaded guilty to the offense, has accepted responsibility, and is genuinely remorseful for the impact his conduct has had not just on his own family, but also on the subjects of the various images and videos Josh had in his possession. It should be noted, the Government observed that Josh committed the offense before state investigators interviewed him and then persisted in the behavior when he was arrested on the federal offense. Josh for his part knew he had a problem, but that problem was much too multi-layered for him to simply decide that he would quit cold turkey and that would be that (though he tried to do just that). Josh understood on some level that he needed help to stop, but he was too ashamed to ask for it, even though he knew he inevitably would be arrested. Now that he is at this juncture, Josh hopes that he gets the assistance he needs to not reoffend.

Additionally, it should be noted that despite his acts, Josh has never been associated with having physical contact with any of the minors involved in these materials or elsewhere. This is not an insignificant observation.

From a 2010 statement from the Association of Treatment of Sexual Abusers (ATSA): A primary concern for professionals who evaluate and treat Internet-facilitated sexual offenders is the risk these individuals may pose for direct contact offenses with victim(s) or future Internet-facilitated sexual offenses such as accessing and/or distributing child pornography. Accurate risk

assessment is critical to decisions involving prioritizing cases by law enforcement and making appropriate recommendations for sentencing, treatment, and level of supervision. Across studies of Internet-facilitated child pornography offenders, approximately one in 10 has an officially known history of contact sexual offending and[,]therefore, can be assessed using one of the established actuarial risk scales. However, the majority of Internet-facilitated sexual offenders have no known history of contact sexual offenses, (although self-report evidence suggests a significant proportion of offenders have committed undetected contact offenses). There is currently no risk measure specifically developed for use with Internet-facilitated offenders who have no official history of sexual offenses.

In short, these studies point to Josh's history not being an indicator that his behavior will escalate to attempting physical contact. This position is further substantiated by Dr. Adkin's Sex Offender Risk Assessment. Dr. Adkins opines that Josh has no indicators suggesting anything other than a low risk of engaging in contact sexual offenses against children.

### The sentencing range established by the guidelines

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders.[1] *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"]. It should be noted that The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback

from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi; *id.* at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." *Id.* at 84. Some offenders "acquire enormous and often well- organized collections," sometimes up to hundreds of thousands of images; some

---

[1] This report appears to reflect the most recent effort by the USSG to address this topic.

"intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of decades" beginning in the pre-Internet era, *id.* at 80. The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at 80-81, 90-91. Some offenders "are very discriminating" and limit their collection by preference. *Id.* at 81. Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks, like Lime Wire, to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Id.* at viii, 61-62.

      The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." *Id.* at 98-99. There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P file- sharing." *Id.* at 98.

      The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." *Id.* at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are

associated with lower rates of recidivism—some of them very significant,'" *id.* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104. Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. *Id.* at ix-x, 204-05. However, "the current guideline measures for offender culpability (*e.g.*, for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321. The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii, 322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more

meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (*e.g.*, the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

### c. A PERIOD OF 36-60 MONTHS PROVIDES JUST PUNISHMENT AND DOES NOT DIMINISH THE SERIOUSNESS OF HIS OFFENSE AND PROVIDES ADEQUATE DETERRENCE AND PROTECTION OF THE PUBLIC—§§ 3553(a)(2)(A)-(C).

A period of incarceration of 36-60 months will not diminish the seriousness of Josh's crime. The Court also has the option to impose at least five years of supervised release. Josh will be subject to all of the standard conditions of supervised release in this district, as well as special conditions (particularly mental health and sex offender treatment) that the Court may choose to impose. If he violates the terms of supervised release, he may be further imprisoned. Cumulatively, these factors will adequately protect the public from any future crimes that Josh might contemplate. A sentence longer than 36-60 months is not necessary to deter him from committing similar offenses. Data shows that long prison sentences do little to deter people from committing future crimes. Dep't. of Justice, Office of Justice Programs, Nat'l Institute of Justice, *Five Things About Deterrence* [2]

Viewing the findings of research on severity effects in their totality, there is evidence suggesting that short sentences may be a deterrent. However, a consistent finding is that increases

in already lengthy sentences produce at best a very modest deterrent effect. *Id.* In fact, lengthy prison sentences may exacerbate recidivism.[3] "Decisions to refrain from crime are based on the mere knowledge that the behavior is legally prohibited or for other non-legal considerations such as morality or fear of social sanctions."[1] In addition, "certainty of apprehension and not the severity of the legal consequence ensuing from apprehension is the more effective deterrent."[4]

In this matter, Josh has been incarcerated since April of 2021. That could have been ten months of Josh beating himself up about how he got to this place in his life: being labelled a sex offender, getting divorced, and looking at spending more time incarcerated. That's not what has happened. Yes, Josh agonizes over not being there for his children, and he knows he will not be there for them in the way a father wants to be for some time more. This is truly the greatest punishment of all for him. Still, Josh has taken the opportunity to self-reflect and to quiet his mind. He has found peace through his faith and through working on his physical well-being. Josh has accepted that there are circumstances in his past and in his present that he cannot change, but he recognizes that he can work to ensure that he does not repeat past mistakes. Josh also recognizes that while he has begun the hard work to rehabilitate, he cannot do it alone. This Court, through the use of its probation department, and perhaps with the guidance Dr. Adkins has offered in her recommendations for treatment, can provide Josh tools to help him lift himself out of his circumstances.

---

[2] (available at http://nij.gov/fivthings/pages/deterrence.aspx).

[3] Josh S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 204 (2013). And even for those "for whom sanction threats might affect their behavior, it is preposterous to assume that their perceptions conform to the realities of the legally available sanction options and their administration." *Id.*

[4] *Id.* at 200-201.

Furthermore, the 36-60 months itself will have an adequate deterrent effect both on Josh and upon others who are similarly situated and might engage in similar conduct. To be an effective deterrent, the sentence must not only educate defendants as to the seriousness of the offense, but should make others in the community "aware that similar actions will be punished." *United States v. Coleman*, 370 F. Supp. 2d 661, 681 (S.D. Ohio 2005), rev'd on other grounds, *United States v. White*, 551 F.3d 381 (6th Cir. Ky. 2008). Again, what will most ensure that Josh does not engage in this conduct again is the sexual offender treatment and mental health programming Court can provide him when he is placed on supervised release. Josh has made up his mind to become a changed man. He now asks this Court to help him make that change.

## IV.     CONCLUSION.

In light of his history and characteristics, the nature and circumstances of this offense, and the sentencing range established for this offense, Joshua Haynes respectfully requests a sentence of 36-60 months incarceration. Mr. Haynes submits that this period of incarceration is sufficient, but not greater than necessary, to punish him for his offense, deter others, and to protect the public.

Respectfully submitted,

DEBORAH L. WILLIAMS
FEDERAL PUBLIC DEFENDER

    /s/    Soumyajit Dutta
Soumyajit Dutta (OH 76762)
Assistant Federal Public Defender
Office of the Federal Public Defender
10 West Broad Street, Suite 1020
Columbus, Ohio    43215-3469
Telephone: (614) 469-2999
Facsimile: (614) 469-5999
Soumyajit_Dutta@fd.org

*Attorney for Defendant*
*Joshua Haynes*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record on the date of filing.

    /s/ Soumyajit Dutta
Soumyajit Dutta (OH 76762)
Soumyajit_Dutta@fd.org